OPINION OF THE COURT
Walter B. Tolub, J.
This is an application to compel the respondents to issue a “delayed registration of birth” pursuant to New York City Health Code (24 RCNY) § 201.11 (a) (3). The motion is granted.
The petitioner claims that he was born in New York City on October 17, 1980. His mother, who was addicted to drugs, died in 1985 without ever obtaining a birth certificate for the petitioner. To date, no contemporaneous documentation has *717 been found to substantiate that petitioner was in fact born in New York City.
To succeed on this application, it is incumbent on the petitioner to present “convincing proof’ that he was born in New York City on or about the date in question (see Matter of Hammod v New York City Dept. of Health, 264 AD2d 582, 583 [1st Dept 1999]). Petitioner claims that without a birth certificate he cannot obtain a driver’s license or apply for admission to colleges. He requests a birth certificate “in order that his presence in society is legitimized and so that he can be recognized as a productive member of society.”
At the outset, it should be noted that petitioner has conducted a thorough and extensive search of the birth records of all the boroughs of New York City for the period in question and has failed to discover any documentation of the petitioner’s birth. A search of Harlem Hospital and St. Luke’s Hospital records, hospitals proximate to where petitioner’s mother allegedly lived at around the time of his birth, has been similarly unavailing. The only documentation we do have that is relevant is the death certificate for petitioner’s mother, Roberta Tucker, also known as Winbish, who died of drug-related causes on September 23, 1985 at St. Luke’s Hospital (petitioner’s exhibit D) and a birth certificate for Charlena Tucker, petitioner’s older sister.
What we do have are affidavits. The first is the affidavit of Sandra Moore, who has provided for the petitioner since he was eight months old and who now wishes to adopt him. She states that sometime in 1980, while Ms. Moore’s daughter and petitioner’s older sister shared an apartment, Ms. Moore’s son cared for the petitioner for a month or two. When petitioner was still an infant, Ms. Moore and her now deceased husband were asked by petitioner’s mother Roberta Tucker (Winbish) to care for Timothy for a “short time.” Roberta Tucker (Winbish) left Timothy, never returned and the Moores finally found out that Timothy’s mother had died.
According to Ms. Moore, sporadic efforts to locate other members of petitioner’s blood relatives were unavailing and the Moores raised Timothy as if he was their own son. They were successful in enrolling Timothy in school; however, it soon became clear that Timothy would require a birth certificate. In or about 1997, the Moores began efforts to obtain a birth certificate for Timothy. The balance of the affidavit relates the unsuccessful attempts at obtaining documentation and/or any “useful” information from the blood relatives of petitioner.
*718 The second affidavit is that of Daniella Tucker-Jennings. A resident of Newport News, Virginia, Ms. Jennings is a maternal aunt of the petitioner and sister of the late Roberta Tucker (Winbish). More particularly, she states:
“During the time that petitioner was conceived and subsequently born, his mother, my sister Roberta was suffering from active drug addiction. As a result of her drug involvement, my sister did not receive any prenatal care and a further result is that Timothy was not born in a hospital, but at where his mother resided.
“I am familiar with the facts and circumstances surrounding Petitioner’s birth and his mother’s drug involvement, it was believed that was he [sic] probably placed in care by New York City. Only recently did I learn that Petitioner has resided in Nassau County since he was an infant and of the unsuccessful efforts to obtain a birth certificate.”
The affidavit of petitioner corroborates that submitted by Sandra Moore and adds little except that he states that he wasn’t aware of the circumstances surrounding his birth until his adolescence and believed until then that Sandra Moore was his mother.
Most informative is the affidavit of Charlena Tucker, petitioner’s sister who was almost 18 years old at the time of petitioner’s birth. Ms. Tucker, a resident of North Carolina, states in her affidavit in relevant part as follows:
“From Brooklyn, where I was born, my mother, brother and I moved to Hollis, Queens, and [then] University Avenue in the Bronx where we lived as a family unit until about 1979. In 1979, when I was about 17 years of age, my mother left our family home in the Bronx and began living on Eighth Avenue and 116th Street in Harlem. After our mother left, my brother and I continued to live in the apartment in the Bronx for as long as we could. Thereafter, we lived with various friends and relatives. It was my brother who learned where our mother lived. However, because of her drug involvement, neither he nor I could stay with her for any length of time. In or about the Spring of 1980,1 began living with some friends on 111th Street, not far from where my mother lived. I saw her fairly regularly. It was then that my mother told me that she was *719 pregnant. That she was pregnant, was visibly obvious to me. Marie, my mother’s friend, whose last name I can no longer remember and who lived with my mother at the time, also told me of my mother’s pregnancy. Although I was not present when he was born, both my mother and her friend Marie, who I believe assisted her, told me she had given birth to Timothy. My mother said that he was born in the house and gave October 17, 1980, as his birth date. I recall her certainty of the date because she said he was born two (2) days before my stepfather’s birthday, which is the 19th of October. Shortly after Timothy’s birth, my mother took Timothy and [went] to the home of her brother, my uncle Lawrence Tucker who lived in Brooklyn at the time. However, after a few months she returned to her apartment on Eighth Avenue. Upon information and belief it is through my uncle Lawrence, with whom she and Timothy stayed, that family members, other than my brother Eugene and I learned of Timothy’s birth. During what had become more often visits to her home because of Timothy, in or about the Spring of 1981, my mother asked me to take and care for him. I could see that my mother knew that she could not take care of Timothy. At the time, I was 18 years of age and really to [sic] young myself to know how to properly take care of a baby. When I went with my friend, Bonita Mickens, to her family’s home in Central Islip, NY I took Timothy with me. Timothy and I lived with Sandra Moore, Bonita Mickens’ mother, until late 1981 or early 1982, when Bonita and I decided to move to the City and took an apartment on Morningside Drive in Manhattan. However, Timothy remained in the care of Sandra Moore. During the time that I lived on Morningside Drive, my mother continued to live on Eighth Avenue in Harlem. Regrettably, my mother was never able to become drug free before her death. I lived in Manhattan for about a year or a year and a half, before moving back to Central Islip, NY, where I lived with Mrs. Priscilla Jones, Bonita’s grandmother. I found a job on Long Island and worked for a number of years before the onset of my health conditions and my subsequent move to North Carolina, where I presently live. Timothy continued to live with Sandra Moore and her family and I saw *720 him regularly until I relocated. ... I know that Timothy was born in the City of New York because: a) both my brother and I were born and raised in the City of New York, b) my mother’s roots were in the City of New York because our immediate family (grandparent, aunts, uncle) were either born or lived in the City of New York and had not lived any other place, c) my mother lived in an area of Harlem where drugs were readily available to her, d) based upon her drug involvement and lack of employment, moving to an unfamiliar place with unfamiliar people would threaten her ability to readily obtain drugs, making it unlikely that my mother, who essentially abandoned my bother [sic] Eugene and me for drugs, would have gone outside the familiar for any reason, including giving birth in a hospital, and especially one outside of the City of New York, for fear of the consequences, e) prior to her death, my mother had been hospitalized, to the best of my recollection, at St. Luke’s and perhaps Harlem Hospitals a few times, f) my mother died a drug related death in the City of New York a little less than five (5) years after Timothy’s birth, which shows, I believe, that in 1979 when she left the Bronx and went to Manhattan, her drug involvement rendered her immobile and caused her to remain in the same area until her death in 1985 . . . .”
This then is the sum and substance of all the evidence in support of the application.
As previously stated, the petitioner is required to establish by convincing evidence that he was born in New York City on October 17, 1980. A party who is required to establish his case by clear and convincing evidence must satisfy the trier of fact that the evidence makes it highly probable that what he claims is what actually happened (see PJI3d 1:64 [2004]; Home Ins. Co. v Karantonis, 156 AD2d 844, 845 [3d Dept 1989]; Solomon v State of New York, 146 AD2d 439, 440 [1st Dept 1989]).
Respondent’s opposition to the instant application is based primarily upon a narrow reading of Health Code (24 RCNY) § 201.11 (a) (3). That section provides as follows: “Such documentary and other evidence as will establish to the satisfaction of the Commissioner or his designee the facts and date of birth as alleged in the application.”
Respondent’s argument is essentially that original documentary evidence is required to establish petitioner’s birth in New *721 York City on that date. Respondent fails to take into account that facts may be proven by direct evidence and by circumstantial evidence (PJI3d 1:70 [2004]; Gayle v City of New York, 92 NY2d 936 [1998]; Schneider v Kings Highway Hosp. Ctr., 67 NY2d 743 [1986]) and that the regulation also states that the Commissioner may consider “other evidence” in addition to any documentary evidence.
As is relevant to the instant case and as the court has charged on numerous occasions:
“Circumstantial evidence is evidence of a fact which does not directly prove a fact in dispute but which permits a reasonable inference or conclusion that the fact exists. . . .
“Those facts which form the basis of an inference must be proved and the inference to be drawn must be one that may be reasonably drawn” (PJI3d 1:70 [2004])
and of course the conclusion to be drawn must not be speculative or questionable.
At the outset, we do have documentation that substantiates that in fact there was a Roberta Winbish who was approximately 41 years old in September 1985 and who died of “sepsis, renal failure, multiple skin ulcers and abscesses due to or as a consequence of intravenous and subcutaneous narcotism.” The second portion of the death certificate, filled out by the funeral director, gives her birthday as July 17, 1942, making her 43 years of age, gives her address as 2186 111th Street, New York, New York, and lists her parents as Arnold Tucker and Thelma Brown (Tucker) of Newport News, Virginia (petitioner’s exhibit D).
The second relevant document is appended as exhibit A to the affidavit of Charlena Verna Tucker. It is her birth certificate and establishes that she was the firstborn daughter of Roberta Tucker.
The balance of the evidence is by way of affidavits, which the court finds credible, and establishes that in the spring of 1980, Charlena Tucker saw her mother regularly, was told and indeed observed that she was pregnant (affidavit of C. Tucker 11 8). Moreover in the affidavit she reports that her mother told her Timothy was born at home on October 17, 1980 (affidavit of C. Tucker 11 9). This then is the direct evidence of Timothy’s birth, albeit it is predicated on the hearsay statement of Roberta Tucker (Winbish).
*722 Additionally, the affidavit of Charlena Tucker presents a very strong cogent argument in paragraph 16, based on circumstantial evidence, that Timothy Tucker’s birth took place within New York City. That line of reasoning has been previously produced and need not be restated here.
The court finds that the evidence here is convincing and therefore directs respondent to provide a birth certificate to the effect that petitioner was born in New York City to Roberta Tucker Wmbish on October 17, 1980.